1

**SARA M. PELQOUIN**
California State Bar No. 254945
2
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3
San Diego, California 92101-5008
Telephone: (619) 234-8467, ext. 3716
4
sara_peloquin@fd.org

5
Attorneys for Mr. Arredondo-Ortiz

6

7

8                         UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10                        **(HONORABLE IRMA E. GONZALEZ)**

11   UNITED STATES OF AMERICA,           )    CASE NO. 08CR0338-IEG
                                         )
12              Plaintiff,               )    DATE:       July 7, 2008
                                         )    TIME:       2:00 P.M.
13   v.                                  )
                                         )    STATEMENT OF FACTS AND
14   GONZALO ARREDONDO-ORTIZ,            )    MEMORANDUM OF POINTS AND
                                         )    AUTHORITIES IN SUPPORT OF
15              Defendant.               )    DEFENDANT'S MOTIONS
     _____)

16

17                                      **I.**

18                              **STATEMENT OF FACTS**

19        On January 23, 2008, Border Patrol Agent Abellon responded to seismic sensor activation in an area

20   known as "Spooner's Mesa" just north of the United States-Mexico border. Abellon found six individuals

21   concealed in the brush and interrogated them regarding their immigration status. All six, are alleged to have

22   admitted being citizens of Mexico with no legal right to enter or remain in the United States.

23        After the individuals were transferred to the Imperial Beach Border Patrol Station one was

24   identified as Gonzalo Arredondo. Records checks revealed that Mr. Arredondo had a criminal and

25   immigration history. Prosecution was authorized. It is alleged that Mr. Arredondo was advised of his

26   Miranda rights and agreed to be interviewed. He is alleged to have made inculpatory statements.

27

28

1    On February 13, 2008, the grand jury returned a true bill of indictment charging Mr. Arredondo

2    with one count of violating 8 U.S.C. § 1326(a) & (b) -Deported Alien Found in the United States.

3    Mr. Arredondo was admitted to lawful permanent residence in 1971,when he was two years old.

4    On August 13,1991, Mr. Arredondo was convicted, after trial, of Second Degree Murder in Florida.  The

5    Immigration and Naturalization Service (INS) initiated deportation proceedings against Mr. Arredondo on

6    December 13, 1994.  In its Order to Show Cause (OSC), the INS alleged that Mr. Arredondo was deportable

7    by reason of having committed an aggravated felony. *See* Exhibit C. On May 30, 1995, Mr. Arredondo

8    requested relief from deportation under section 212 (c) of the I.N.A. (repealed 1996). *See* Exhibit D.  On

9    October 31, 1995, the Immigration Judge (IJ) granted the requested relief.  *See* Exhibit E.  On November

10   3, 1995, the INS appealed to the Bureau of Immigration Appeals (BIA) alleging misuse of the IJ's

11   discretion. *See* Exhibit F.  The BIA held that Mr. Arredondo was statutorily ineligible for discretionary relief

12   under AEDPA on March 12, 1997,this issue was never raised or briefed by the parties. *See* Exhibit G.

13   These motions follow.

14                                                    **II.**

15   **THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S
     INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY
16   RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH
     AMENDMENT BY DEPRIVING MR. ARREDONDO OF THE TRADITIONAL
17   FUNCTIONING OF THE GRAND JURY**

18   **A.    Introduction.**

19   The indictment in the instant case was returned by the January 2007 grand jury.  <u>See</u> CR at 6.[1]  That

20   grand jury was instructed by Judge Burns on January 11, 2007.  <u>See</u> Reporter's Partial Transcript of the

21   Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  Judge Burns's

22   instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit

23   cases challenging a form grand jury instruction previously given in this district in several ways.[2]  These

24

25        [1] "CR" refers to the Clerk's Record in Case Number 07CR2364-LAB.

26        [2] <u>See</u>, <u>e.g.</u>, <u>United States v. Cortez-Rivera</u>, 454 F.3d 1038 (9th Cir. 2006); <u>United States v. Navarro-
27   Vargas</u>, 408 F.3d 1184 (9th Cir.) (<u>en banc</u>), cert. denied, 126 S. Ct. 736 (2005) (<u>Navarro-Vargas II</u>); <u>United
     States v. Navarro-Vargas</u>, 367 F.3d 896 (9th Cir. 2004)(<u>Navarro-Vargas I</u>); <u>United States v. Marcucci</u>, 299
28   F.3d 1156 (9th Cir. 2002) (per curiam).

instructions compounded Judge Burns's erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A. See Reporter's Transcript of Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[3]

1.    **Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which it excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns's discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, the Court not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

---

[3] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the role of the grand jury. Mr. Arredondo-Ortiz requests that the video presentation be produced. See United States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret, but the ground rules by which the grand jury conducts those proceedings are not.").

[4] See also id. at 20 ("You're all about probable cause.").

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

*See* Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing is Judge Burns's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Arredondo will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, Judge Burns provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge Burns let the grand juror know that it would not want him or her to decline to indict in an individual case where the grand juror "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See id. Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made manifest by Judge Burns's use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even if [the CSW] thought the evidence warranted it." See id. Again, Judge Burns's question provided no context; it inquired regarding "a case," a term presumably just as applicable to possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror listening to this exchange could only conclude that there was *no* case in which Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in his exchange with REA. REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

> The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
> REA: It would depend on the case.
> The Court: Is there a chance that you would do that?
> REA: Yes.
> The Court: I appreciate your answers. I'll excuse you at this time.

Id. at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should. Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause. Again, Judge Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate. The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going

forward."[5]  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict

was too great a risk to run.

**2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

In addition to his instructions on the authority to choose not to indict, Judge Burns also assured the

grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See

Ex. A at 20.[6]

> Now, again, this emphasizes the difference between the function of the grand jury and the
> trial jury.  You're all about probable cause.  If you think that there's evidence out there that
> might cause you to say "well, I don't think probable cause exists," then it's incumbent upon

---

[5] This point is underscored by Judge Burns's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

[6] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys.  See Ex. A at 9-10.  Judge Burns's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, Judge Burns would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors."  Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1    you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are*
2    *duty-bound to present evidence that cuts against what they may be asking you to do if they're*
     *aware of that evidence.*

3    Id. (emphasis added).

4        The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

5    "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns

6    gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's

7    something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that."

8    See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any

9    evidence that was "adverse" or "that cuts against the charge." See id.

10   **B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers of the**
11   **Grand Jury, Which Judge Burns Far Exceeded in His Instructions as a Whole During**
     **Impanelment.**

12       The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

13   grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

14   Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

15   approach[7] to the problems posed by the instructions, endorsed many of the substantive arguments raised by

16   the defendants in those cases. The district court's instructions cannot be reconciled with the role of the

17   grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the

18   January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the

19   direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and

20   utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers

21   envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

22       For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

23   II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

24   deciding whether a particular prosecution shall be instituted or followed up, performs much the same

25   function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

26

27       [7]  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority
     because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an
28   inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional
     independence.").

08CR0338-IEG

1   510 (1978)). Accord <u>United States v. Navarro-Vargas</u>, 367 F.3d 896, 900 (9th Cir. 2004) (<u>Navarro-Vargas</u>

2   <u>I</u>)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

3   prosecutorial." ). See also <u>Navarro-Vargas II</u>, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that

4   the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, <u>id.</u>,

5   but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted

6   by the prosecutor." <u>Id.</u> See Niki Kuckes, <u>The Democratic Prosecutor: Explaining the Constitutional</u>

7   <u>Function of the Federal Grand Jury</u>, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict

8   was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

9   insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., <u>Criminal</u>

10  <u>Procedure</u> § 15.2(g) (2d ed. 1999)).

11      Indeed, the <u>Navarro-Vargas II</u> majority agrees that the grand jury possesses all the attributes set forth

12  in <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986). See <u>id.</u>

> The grand jury thus determines not only whether probable cause exists, but also whether to
> "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
> most significant of all, a capital offense or a non-capital offense -- all on the basis of the
> same facts. And, significantly, the grand jury may refuse to return an indictment even
> "'where a conviction can be obtained.'"

16  <u>Id.</u> (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed <u>Vasquez</u>'s description of

17  the grand jury's attributes in <u>Campbell v. Louisiana</u>, 523 U.S. 392 (1998), noting that the grand jury

18  "controls not only the initial decision to indict, but also significant questions such as how many counts to

19  charge and whether to charge a greater or lesser offense, including the important decision whether to charge

20  a capital crime." <u>Id.</u> at 399 (citing <u>Vasquez</u>, 474 U.S. at 263). Judge Hawkins notes that the <u>Navarro-</u>

21  <u>Vargas II</u> majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the

22  power to refuse to indict someone even when the prosecutor has established probable cause that this

23  individual has committed a crime." <u>See id.</u> at 1214 (Hawkins, J. dissenting). Accord <u>Navarro-Vargas I</u>, 367

24  F.3d at 899 (Kozinski, J., dissenting); <u>United States v. Marcucci</u>, 299 F.3d 1156, 1166-73 (9th Cir. 2002)

25  (per curiam) (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys strong

26  support in the Ninth Circuit. But not in Judge Burns's instructions.

27

28

1

**C.    Judge Burns's Instructions Forbid the Exercise of Grand Jury Discretion Established
in Both <u>Vasquez</u> and <u>Navarro-Vargas II.</u>**

2

3       The <u>Navarro-Vargas II</u> majority found that the instruction in that case "leave[s] room for the grand

4    jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

5    decision in <u>Marcucci</u>. <u>Marcucci</u> reasoned that the instructions do not mandate that grand jurors indict upon

6    every finding of probable cause because the term "should" may mean "what is probable or expected."  299

7    F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

8    Hawkins ably pointed out.  <u>See</u> <u>Navarro-Vargas II</u>, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

9    instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

10   obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  <u>See</u>

11   <u>also</u> <u>id.</u> ("The 'word' should is used to express a duty [or] obligation.") (quoting <u>The Oxford American</u>

12   <u>Diction and Language Guide</u> 1579 (1999) (brackets in original)).

13      The debate about what the word "should" means is irrelevant here; the instructions here make no

14   such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

15   choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

16   disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote

17   against indicting even though I think that the evidence is sufficient'...."  <u>See</u> Ex. A at 8-9.  Thus, the

18   instruction flatly bars the grand jury from declining to indict because they disagree with a proposed

19   prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess

20   "the need to indict."  <u>Vasquez</u>, 474 U.S. at 264.

21       While Judge Burns used the word "should" instead of "shall" during voir dire with respect to

22   whether an indictment was required if probable cause existed, <u>see</u> Ex. B at 4, 8, in context, it is clear that

23   Judge Burns could only mean "should" in the obligatory sense.  For example, when addressing a prospective

24   juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, it told them

25   that if there is not probable cause, "then the grand jury should hesitate and not indict."  <u>See</u> <u>id.</u> at 8.  At least

26   in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of

27   "leaving room for the grand jury to [indict] even if it finds [no] probable cause."  <u>See</u> <u>Navarro-Vargas</u>, 408

28   F.3d at 1205.  Clearly Judge Burns was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then Judge Burns would have to have intended two different meanings of the word "should" in the space of two consecutive sentences. That could not have been his intent. But even if it were, no grand jury could ever have had that understanding.[8] Jurors are not presumed to be capable of sorting through internally contradictory instructions. See generally United States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

**(1)** The first occasion occurred in the following exchange when Judge Burns conducted voir dire and excused a potential juror (CSW):

---

[8] This argument does not turn on Mr. Arredondo's view that the Navarro-Vargas/Marcucci reading of the word "should" in the model instructions is wildly implausible. Rather, it turns on the context in which the word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-Vargas/Marcucci reading as a possibility.

> The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective juror. Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

    **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative.

> Court  . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that Judge Burns's point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because his message is that there is no discretion not to indict.

(**3**)     As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

(**4**)     And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the penalties to which indicted persons may be subject.

> Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is about because there is a disparity between state and federal law.
> The Court:  In what regard?
> Prospective Juror: Specifically, medical marijuana.
> The Court:  Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that.* We want you to make a business-like decision of whether there was a probable cause. ...

See Ex. B at 24-25 (emphasis added). A "business-like decision of whether there was a probable cause" would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci. See

United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006). Cortez-Rivera is inapposite for two reasons. First, Judge Burns did not use the term "should" in the passage quoted above. Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera. The instructions again violate Vasquez, which plainly authorized consideration of penalty information. See 474 U.S. at 263.

Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause. These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez. Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts. Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime."). Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict." See id. at 264. Judge Burns's grand jury is not Vasquez's grand jury. The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding." See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992). The indictment must therefore be dismissed. Id.

The Navarro-Vargas II majority's faith in the structure of the grand jury is not a cure for the instructions excesses. The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its decisions." 408 F.3d at 1200. As a result, the majority discounts the effect that a judge's instructions may

1  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

2  independent." Id. at 1202 (emphases in the original).

3  　　　　Judge Hawkins sharply criticized this approach. The majority, he explains, "believes that the

4  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

5  of many of its decisions -- sufficiently protects that power." See id. at 1214 (Hawkins, J., dissenting). The

6  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

7  making a probable cause determination ... unconstitutionally undermines the very structural protections that

8  the majority believes save[] the instruction." Id. After all, it is an "'almost invariable assumption of the law

9  that jurors follow their instructions.'" Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)). If that

10  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

11  in Vasquez. Indeed, "there is something supremely cynical about saying that it is fine to give jurors

12  erroneous instructions because nothing will happen if they disobey them." Id.

13  　　　　In setting forth Judge Hawkins' views, Mr. Arredondo-Ortiz understands that Judge Burns may not

14  adopt them solely because the reasoning that supports them is so much more persuasive than the majority's

15  sophistry. Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

16  Here, again, the question is not an obscure interpretation of the word "should", especially in light of the

17  instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the

18  Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on

19  the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell,

20  and both Navarro-Vargas II opinions. Navarro-Vargas II is distinguishable on that basis, but not only that.

21  Judge Burns did not limit itself to denying the grand jurors the power that Vasquez plainly states they enjoy.

22  He also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative,

23  excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8;

24  Ex. B at 17, 28. The structure of the grand jury and the secrecy of its deliberations cannot embolden grand

25  jurors who are no longer there, likely because they expressed their willingness to act as the conscience of

26  the community. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury

27  exercising its powers under Vasquez "serves ... to protect the accused from the other branches of

28  government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d

1  1061, 1066 &  n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

2  their own initiative, rules of grand jury procedure," <u>United States v. Williams</u>, 504 U.S. 36, 50 (1992), and,

3  here, Judge Burns has both fashioned his own rules and enforced them.

4  **D.  The Instructions Conflict with <u>Williams</u>' Holding That There Is No Duty to Present**
   **Exculpatory Evidence to the Grand Jury.**

5

6  In <u>Williams</u>, the defendant, although conceding that it was not required by the Fifth Amendment,

7  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

8  exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

9  common law.  <u>See</u> 504 U.S. at 45, 51.  <u>Williams</u> held that "as a general matter at least, no such 'supervisory'

10  judicial authority exists."  <u>See id.</u> at 47.  Indeed, although the supervisory power may provide the authority

11  "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

12  amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by Judge

13  Burns and by Congress to ensure the integrity of the grand jury's functions,'" <u>id.</u> at 46 (citation omitted),

14  it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."

15  <u>Id.</u> at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

16  initiative, rules of grand jury procedure."  <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

17  claim, both as an exercise of supervisory power and as Fifth Amendment common law.  <u>See id.</u> at 51-55.

18  Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would present

19  to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

20  > Now, again, this emphasizes the difference between the function of the grand jury and the
21  > trial jury.  You're all about probable cause.  If you think that there's evidence out there that
   > might cause you say "well, I don't think probable cause exists," then it's incumbent upon
22  > you to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are*
   > *duty-bound to present evidence that cuts against what they may be asking you to do if they're*
   > *aware of that evidence*.
23

24  <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

25  duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

26  [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  <u>See</u>

27  <u>id.</u> at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  <u>See</u>

28  <u>Navarro-Vargas</u>, 408 F.3d at 1207.

This particular instruction has a devastating effect on the grand jury's protective powers, particularly if it is not true. It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not conveyed by the previous instruction: "You're all about probable cause." <u>See</u> Ex. A at 20. Thus, once again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely would be excused if they rejected this limitation). The instruction goes on to tell the grand jurors that they should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor will present it. The end result, then, is that grand jurors should consider evidence that goes against probable cause, but, if none is presented by the government, they can presume that there is none. After all, "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." <u>See</u> <u>id.</u> Moreover, during voir dire, Judge Burns informed the jurors that "my experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. *They have a duty to do that*." <u>See</u> Ex. B at 14-15 (emphasis added). Thus, if the exculpatory evidence existed, it necessarily would have been presented by the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." <u>See</u> Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

    (1)    I have to consider evidence that undercuts probable cause.

    (2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.

    (3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

### III.

### THE INDICTMENT SHOULD BE DISMISSED DUE BECAUSE MR. ARREDONDO'S DEPORTATION WAS INVALID

**A.    Mr. Arredondo has the right to collaterally attack the underlying deportation order.**

An individual charged with 8 U.S.C. § 1326 has the right to collaterally attack the underlying removal order on due process grounds. United States v. Mendoza Lopez, 481 U.S. 828, 837-38 (1987) (holding that " where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding."); United States v. Ubaldo-Figeroa, 364 F.3d 1042 (9th Cir. 2003) (same).

8 U.S.C. § 1326 (d) provides:

> In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1)of this section or subsection (b) of this section unless the alien demonstrates that–
>
> (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
> (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and,
> (3) the entry of the order was fundamentally unfair.

**B.    Mr. Arredondo's Case Was Administratively Exhausted.**

Mr. Arredondo was granted 212(c) relief from deportation by Immigration Judge (IJ) Ira Sandron, on October 31, 1995. See Exhibit E.   The INS appealed to the Board of Immigration Appeals (BIA). See Exhibit F.

**C.    Mr. Arredondo Was Improperly Deprived of Judicial Review**

Mr. Arredondo was deprived of judicial review of his claim to relief from deportation under section 212(c).  The BIA improperly determined that Mr. Arredondo was statutorily ineligible for 212(c) relief based on his aggravated felony conviction under the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA).  In fact, in its order of removal the BIA affirmatively misadvised Mr. Arredondo that his only remedy was to seek a re-opening of his case under <u>Matter of Soriano,</u> Interim Decision 3289 (A.G., Feb. 21, 1997), for the limited purpose of contesting deportability.  *See* Exhibit G.  The BIA did not advise Mr. Arredondo of his right to seek judicial review of the BIA's decision, rather the BIA misadvised Mr. Arredondo that his only remedy was to seek a reopening under <u>Matter of Soriano</u>, a decision overruled by the Supreme Court in <u>United States v. St. Cyr</u>, 533 U.S. 289 (2001).

**D.    The Entry of the Order of Removal Was Fundamentally Unfair**

"An underlying removal order is 'fundamentally unfair' if:  (1) [a defendant's] due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects.'" <u>Ubaldo-Figueroa</u>, 364 F.3d at 1048 (quoting <u>Zarate-Martinez</u>, 133 F.3d at 1197).

1.    <u>**Mr. Arredondo's Due Process Rights Were Violated When the BIA Retroactively Applied AEDPA to Deprive Him of Relief From Deportation**</u>.

The presumption against retroactive legislation is "deeply rooted in our nation's jurisprudence." <u>Landgraf v. US Film Products</u>, 511 U.S. 244, 265 (1994).  A statute has a retroactive effect where it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." <u>St. Cyr</u>, 533 U.S. at 321 (quoting <u>Society for Propagation of the Gospel v. Wheeler</u>, 22 F. Cas. 756, 767).  The question of retroactive effect is to be informed by "familiar considerations of fair notice, reasonable reliance, and settled expectations." <u>Landgraf</u>, 511 U.S. 244, 270.

<u>Landgraf</u> was a sexual harassment case in which the District Court found that the plaintiff had been sexually harassed by her employer causing mental anguish, but had left her job for unrelated reasons. <u>Landgraf</u>, 511 U.S. 244.  The District Court dismissed the complaint because she was not then entitled to equitable relief under the Title VII of the Civil Rights Act.  <u>Id</u>.  While Landgraf's appeal was pending Title VII was amended to proved for money damages and a jury trial. <u>Id</u>.  Although, Landgraf's employer could not have reasonably relied on the more lenient law when choosing to engage in the harassing conduct, the Supreme Court nevertheless found that the amendments to the Title VII attached new consequences to past conduct and could not be applied retroactively.  <u>Id</u>.

1    In I.N.S. v. St. Cyr, 533 U.S. 289 (2001), the Supreme Court held that the retroactive application of

2  AEDPA to aliens convicted of aggravated felonies was impermissible.  The analysis in St. Cyr was one of

3  statutory construction, in which the Court held that there was no clearly expressed Congressional intent for

4  the statute to apply retroactively.  St. Cyr, 533 U.S. 289 . In St. Cyr, the court concluded that AEDPA

5  changed the consequences attendant to an alien's decision to plead guilty to an offense by eliminating

6  possible relief from deportation, resulting in a retroactive effect.  Id.  The Court bolstered its reasoning using

7  the reasonable reliance principle articulated in Landgraf.  Specifically, St. Cyr's reliance on the availability

8  of relief from deportation in his decision to plead guilty and the *quid pro quo* exchanged with the

9  government with respect to his plea. Id.

10    In Hernandez de Anderson v. Gonzalez, the Ninth Circuit found that the provisions of IIRIRA which

11  repealed suspension of deportation relief was impermissibly retroactive where Hernandez de Anderson

12  reasonably relied on this potential relief when seeking naturalization, although she was deportable for

13  having been convicted, after trial, of an aggravated felony. 497 F.3d 927 (9th Cir. 2007).  The Ninth Circuit

14  held that Hernandez de Anderson showed objectively reasonable reliance by waiting until she had accrued

15  the ten year period of good moral character necessary for suspension of deportation before applying for

16  naturalization, even though she was eligible for naturalization five years earlier. Id.

17    Reliance is, however, not a necessary element of the retroactivity analysis.  It is sufficient if a law

18  attaches new consequences to past events.  Hughes Aircraft Co. v. United States ex rel Schumer, 520 U.S.

19  939, 946 (holding that the elimination of certain defenses to *qui tam* suits under the False Claims Act was

20  impermissibly retroactive without discussing detrimental reliance on prior law);  Olatunji v. Ashcroft, 387

21  F.3d 383 (showing of reasonable reliance not required to conclude IIRIRA impermissibly retroactive as

22  applied to an alien who pleaded guilty to a crime which later became a grounds for inadmissibility under

23  IIRIRA) (4th Cir. 2004);  Ponnapula v. Ashcroft, 373 F.3d 480 (3rd Cir. 2004) (reasonable reliance under St.

24  Cyr is merely one application of Landgraf principles, an alien may reasonably rely on availability of 212(c)

25  relief in deciding to reject a plea offer and go to trial). *But see*, Armendariz-Montoya v. Sonchik, 291 F.3d

26  1116 (9th Cir. 2002) (alien who goes to trial cannot claim detrimental reliance on availability of 212 (c)

27  because he cannot claim he would have acted any differently); Saravia-Paguada v. Gonzalez, 488 F.3d 1122

28  (9th Cir. 2007) (confining St. Cyr retroactivity analysis to the context of guilty pleas).

The BIA impermissibly applied AEDPA retroactively to deprive Mr. Arredondo of the relief granted by the IJ in 1995. When Mr. Arredondo was convicted of an aggravated felony in 1991 he was eligible for 212(c) relief. He was equally eligible in 1994 when the INS initiated deportation proceedings. He was eligible for relief from deportation on October 31, 2005, when the IJ granted him cancellation of removal under § 212 (c). AEDPA did not take effect until April 26, 1996, nearly six months after Mr. Arredondo was granted relief from deportation. The application of AEDPA attached new legal consequences to prior events by depriving Mr. Arredondo of previously obtained relief. Therefore, the application of AEDPA had an impermissible retroactive effect.

Because reasonable reliance is only one of the factors to consider under Landgraf, and the traditional presumption is against retroactivity, the BIA's application of AEDPA to deprive Mr. Arredondo of relief from deportation was impermissible.

The retroactive application of AEDPA in Mr. Arredondo's case is also impermissible under the Landgraf principles due to lack of notice. At the time the BIA issued the order of deportation Mr. Arredondo had been in deportation proceedings for over three years. He had applied for and was granted relief from deportation under I.N.A. § 212(c). In its appeal of the IJ's discretionary grant of relief, the INS did not raise AEDPA as a ground of statutory ineligibilty. Consequently, neither party addressed the question of the retroactive applicability of AEDPA in its briefs to the BIA. Rather the BIA, without requesting additional briefing, applied AEDPA, a law which took effect over three years after Mr. Arredondo was placed in deportation proceedings and almost six months after he was granted 212(c) relief by the IJ.

At no time could Mr. Arredondo have had notice that AEDPA might apply to him. Therefore, the lack of notice upset settled expectations that Mr. Arredondo was eligible for the relief he had requested and obtained after a hearing before the IJ.

### 2.  **Mr. Arredondo was prejudiced.**

Mr. Arredondo was per se prejudiced because he had already applied for and been granted 212 (c) relief by the Immigration Judge.

Mr. Arredondo's due process rights were violated at his deportation hearing in 1997. He suffered prejudice as a result of that due process violation. The government may not therefore use Mr. Arredondo's

1997 deportation as a basis for its prosecution. As there is no other removal order on which the government

may rely, Mr. Perez Ramos requests that this Court dismiss the indictment.

**IV.**

**THIS COURT SHOULD SUPPRESS ALL STATEMENTS
MADE BY MR. ARREDONDO**

**A.    The Court Must Suppress Mr. Arredondo' Alleged Pre-Miranda Field Statements Because
They Were Elicited as the Result of Custodial Interrogation.**

    The material produced thus far by the government indicates that Agent Abellon first confronted and

interrogated Mr. Arredondo regarding his immigration status. This entire interrogation proceeded any form

of administration of Miranda rights by the agents by approximately five hours.

    "The ruling in Miranda prohibits 'custodial interrogation' unless the government first gives warnings

to the [subject of the interrogation]." United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir.

1990). Custodial interrogation occurs when under the totality of the circumstances the questions asked by

the police are reasonably likely to elicit an incriminating response from the subject. Id. Although questions

that include routine biographical information usually do not trigger the safeguard of Miranda v. Arizona,

"[t]hat exception is inapplicable . . . where the elicitation of information regarding immigration status is

reasonably likely to inculpate the [subject]." Id.

    In United States v. Kim, 292 F.3d 971, 973 (9th Cir. 2002),[9] the Ninth Circuit noted that the

following factors are to be considered in deciding whether or not a police-dominated atmosphere exists:

"(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with

evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and

(5) the degree of pressure applied to detain the individual." Id. (citations omitted); see also United States

v. Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980) (in context of custody at the border "[t]he factors to

be weighed are the language used to summon him, the physical surroundings of the interrogation, the extent

to which he is confronted with evidence of his guilt, and the pressure exerted to detain him."). The Ninth

---

    [9] In Kim, the Ninth Circuit found that a Korean woman who went to her own store, voluntarily, because an officer's visit prompted her to do so was in custody even though she was in familiar surroundings because the police "temporarily took over complete control of Kim's store creating a 'police-dominated atmosphere.'" 292 F.3d at 977. This combined with difficulty with English and isolation from family supported the finding that Kim did not willingly agree to submit to an encounter with the police. Id.

1  Circuit also recognizes that "question[s] implying that [the agent] suspected [the defendant] of criminal

2  activity" can give rise to a reasonable belief that one is not free to ignore the questions and leave.  United

3  States v. Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).[10]

4        It is not necessary that an individual be physically restrained in any fashion. In Beraun-Panez, the

5  Ninth Circuit found that an individual questioned out in an open field, who was neither held nor handcuffed

6  nor told that he was under arrest, was nonetheless in custody for Miranda purposes.  Beraun-Panez held that

7  "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding."

8  812 F.2d at 580.[11]

9        Here, the criteria for a police-dominated atmosphere as articulated in Kim are clearly met.  The

10  report does not state the exact words Agent Abellon used to identify himself as a border patrol agent.

11  Whichever words used unambiguously indicated to Mr. Arredondo  that Agent Abellon was a law

12  enforcement officer and that Mr. Arredondo  was in custody. Because Agent Abellon was in uniform,

13  carrying his gun, and Mr. Arredondo was a pedestrian in an isolated area, Mr Arredondo reasonably did not

14  feel free to leave.

15        Concerning the extent to which Mr. Arredondo was confronted with guilt, he was apprehended and

16  immediately interrogated about his immigration status.  It is, however, unclear how long the detention took

17  place or the amount of pressure applied to Mr. Arredondo since Agent Abellon's report does not address

18  the duration of  the interrogation and detention  and only uses boiler-plate language to describe

19  Mr. Arredondo's responses.  Agent Abbellon confronted and interrogated Mr. Arredondo regarding his

20  suspected criminal activity of being unlawfully present in the United States without the benefit of Miranda

21  warnings.  Thus, the statements must be suppressed.

22        Not only did the questioning here occur in a "police-dominated atmosphere" where Mr. Arredondo

23  was isolated, the agent's questioning bore on Mr. Arredondo's alienage, which is an element of the charged

24  offense, 8 U.S.C. § 1326.  See United States v. Meza-Soria, 935 F.2d 166, 171 (9th Cir. 1991).  This

25  question in such a setting carried with it implicit suspicion of criminal activity. A person, such as

26

27        [10] Chavez-Valenzuela involved a roadside stop of a motorist on a public street, out in the open.

28        [11] The police confronted Beraun-Panez with his alienage, accused him of lying and kept him
separated from his co-worker in a remote rural area.  Beraun-Panez, 812 F.2d at 580.

1  Mr. Arredondo, subjected to such questioning in such a situation obviously does not reasonably feel free

2  to leave, and thus is subject to custodial interrogation. See Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir.

3  2001).

4          In the context of an encounter between border patrol and an individual near the international border,

5  any questioning regarding an individual's alienage falls under the rubric of custodial interrogation.

6  Furthermore, because of the close relationship between civil and criminal immigration investigations,

7  "[c]ivil as well as criminal interrogation of in-custody defendants by INS [agents] should generally be

8  accompanied by the Miranda warnings."  United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir.

9  1983).

10         In United States v. Gonzalez-Sandoval, 894 F.2d at 1043 (9th Cir. 1990), the defendant appeared

11  at a local police station to provide his state parole officer with a urine sample. Id. at 1046. A second parole

12  officer accused Mr. Gonzalez-Sandoval of being a deported alien and called the Border Patrol. Id. The

13  Border Patrol came to the station, and without warning him pursuant to Miranda, asked Mr.Gonzalez-

14  Sandoval where he was born and whether he possessed documents to verify the legality of his presence in

15  the United States.  Id.  The Border Patrol agents then took Mr. Gonzalez-Sandoval to the Calexico Border

16  Patrol Station. Failing to administer the Miranda warnings a second time, the agents questioned

17  Mr. Gonzalez-Sandoval about any alias he possessed.  Id.  The agents ran an INS record check against

18  Mr. Gonzalez-Sandoval's name and alias, and found Mr. Gonzalez-Sandoval's prior immigration record.

19  Id. The Ninth Circuit found that the district court erred in failing to suppress the unwarned, prompted

20  statements by Mr. Gonzalez-Sandoval about his name and alias.  Id. at 1047.

21         In United States v. Mata-Abundiz, an INS agent visited the defendant in a state jail to obtain

22  biographical information to determine the defendant's citizenship status. 717 F.2d at 1278. The agent knew

23  about the state charges against Mr. Mata-Abundiz, and did not warn him pursuant to Miranda prior to

24  obtaining the biographical data.  Id. Afterwards, the agent made further inquiries at his office and within

25  three hours returned to the jail to charge Mr. Mata-Abundiz with a federal immigration offense. Id. Despite

26  the fact that the agent characterized his interrogation as pursuant to a civil investigation, the court held that

27  the agent should have warned Mr. Mata-Abundiz as required by Miranda because the agent knew his

28  interrogation could lead to federal charges against the defendant.  Id. at 1278-1279.

1   Here, it is obvious that the information the agent elicited from Mr. Arredondo, during the

2   interrogation, regarding his citizenship, application for permission to enter, and use of a document was

3   "reasonably likely to inculpate" him.  The questions served no purpose other than inculpation. They are in

4   fact two of the four elements that they government must prove to obtain a conviction for a violation of 8

5   U.S.C. § 1326. Moreover, it is undisputed that Mr. Arredondo was not read his <u>Miranda</u> rights at that point,

6   nor advised that his answers to the agent's questions could result in federal charges against him. Therefore,

7   statements must be suppressed.

8   **C.    Mr. Arredondo's Statements Must Be Suppressed Because They Were Involuntary.**

9   Even when the procedural safeguards of <u>Miranda</u> have been satisfied, a defendant in a criminal case

10  is deprived of due process of law if the conviction is founded upon an involuntary confession.  <u>Arizona v.</u>

11  <u>Fulminante</u>, 499 U.S. 279 (1991); <u>Jackson v. Denno</u>, 378 U.S. 368, 387 (1964).  The government bears the

12  burden of proving by a preponderance of the evidence that a confession is voluntary. <u>Lego v. Twomey</u>, 404

13  U.S. 477, 483 (1972).

14  In order to be voluntary, a statement must be the product of a rational intellect and free will.

15  <u>Blackburn v. Alabama</u>, 361 U.S. 199, 208 (1960).  In determining whether a defendant's will was overborne

16  in a particular case, the totality of the circumstances must be considered.  <u>Schneckloth v. Bustamonte</u>, 412

17  U.S. 218, 226 (1973).  Some factors taken into account have included the youth of the accused, his lack of

18  education, his low intelligence, the lack of any advice to the accused of his constitutional rights, the length

19  of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment

20  such as the deprivation of food or sleep.  <u>Id.</u>

21  A confession is deemed involuntary whether coerced by physical intimidation or psychological

22  pressure.  <u>Townsend v. Sain</u>, 372 U.S. 293, 307 (1962).  "The test is whether the confession was `extracted

23  by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by

24  the exertion of any improper influence.'"  <u>Hutto v. Ross</u>, 429 U.S. 28, 30 (1976) (<u>quoting</u> <u>Bram v. United</u>

25  <u>States</u>, 168 U.S. 532, 542-43 (1897)).  <u>Accord</u>, <u>United States v. Tingle</u>, 658 F.2d 1332, 1335 (9th Cir. 1981).

26  Until the government meets its burden of showing all statements of the defendant that it intends to use at

27  trial were voluntary, all statements -- even those taken before he was in "custody" -- must be suppressed

28  as involuntary.

**D.  Mr.Arredondo Requests That This Court Conduct An Evidentiary Hearing.**

This Court must make a factual determination as to whether a statement was voluntarily given prior to its admission into evidence.  18 U.S.C. § 3501(a).  Where a factual determination is required, courts are obligated by Fed. R. Crim. P. 12 to make factual findings.  See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990).  Because "'suppression hearings are often as important as the trial itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleading.

Under section 3501(b), this Court must consider various enumerated factors in making the voluntariness determination, including whether the defendant understood the nature of the charges against his and whether she understood his rights.  Without the presentation of evidence, this Court cannot adequately consider these statutorily mandated factors. Mr. Arredondo accordingly requests that this Court conduct an evidentiary hearing pursuant to 18 U.S.C. § 3501(a), to determine, outside the presence  of the jury, whether any and all statements made by him were voluntary.

**V.**

**MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

Defense counsel has received 516 pages of discovery at this time, however investigation of this case is not complete.  Information that comes to light as a result of further investigation may necessitate the filing of additional motions.  Therefore, counsel requests leave to file additional motions once investigation is completed.

**VI.**

**CONCLUSION**

For the reasons stated above, Mr. Arredondo respectfully requests that this Court grant the foregoing motions.

Respectfully submitted,

Dated:  May 27, 2008            */s/ Sara M. Peloquin*
                               **SARA M. PELOQUIN**
                               Federal Defenders of San Diego, Inc.
                               Attorneys for Mr. Arredondo-Ortiz